**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**EAST SUSSEX CHILDREN SERVICES,**

        Petitioner,

**v.**
                                **CIVIL ACTION NO. 3:12-CV-141**
                                **(JUDGE GROH)**

**CARLY LOUISE MORRIS and**
**RALPH REGIS MORRIS,**

        Respondents.

## MEMORANDUM OPINION AND ORDER GRANTING VERIFIED PETITION FOR RETURN OF CHILD TO THE UNITED KINGDOM

### I. Introduction

       This matter is currently before the court on Petitioner East Sussex Children Services' Verified Petition For Return of Child to United Kingdom ("Petition") [Doc. 1]. For the following reasons, the Court **GRANTS** the Petition.

### II. Facts and Procedural History

       The Court finds the following facts based upon the evidence and testimony adduced at the final hearing. This action involves a minor child, S.A.M., born in 2000. Pet.'s Ex. 1.[1] Respondent Carly Louise Morris ("Mother") is S.A.M.'s mother and a citizen of the United Kingdom. Respondent Ralph Regis Morris ("Step-Father") is the Mother's husband, S.A.M's step-father, and a citizen of the United States. Mother and

---

[1]Because Respondents submitted no Exhibits, all references to Exhibits are to Petitioner's Exhibits.

Step-Father met on the internet through mutual friends on Facebook while playing a vampire application game.  They were married on September 27, 2010 in Cecil County, Maryland. Pet.'s Ex. 2.

Petitioner, East Sussex Children Services ("East Sussex"), is the social services division of the East Sussex County Council.  East Sussex has supervised S.A.M. since February 21, 2010 because S.A.M. is subject to a Child Protection Plan after East Sussex found neglect and risk of emotional harm to S.A.M. and her half-brother, A.[2] Since October 2010, there have been ongoing proceedings regarding S.A.M.'s care, residence, and contact in the Hastings County Court in England and in the High Court of Justice, Principal Registry of the Family Division in England. Katie Smee-Giles, a senior practitioner at East Sussex, has supervised S.A.M.'s case since July 11, 2011.

In the proceedings involving S.A.M., Mother sought leave of court to remove S.A.M. permanently from the United Kingdom and to relocate S.A.M. to the United States to live with Step-Father.  *See* Pet.'s Ex. 3. In December 2011, the Hastings County Court did not grant Mother permission to relocate with S.A.M., and the court ordered Mother to file a statement with the court "(a) setting out the status and chronology of any application for a visa for herself and S.A.M. to move to the USA, (b) her intention as to her domestic arrangement if and when she relocates, and © her proposal for the future contact of S.A.M. and herself with A. If and when she does settle in the USA." *Id.*  Mother and Step-Father were also ordered to cooperate in a background check to be conducted by Children and Families Across Borders, which

---

[2]A. is not subject to this proceeding as he is still in the United Kingdom, residing with his biological father.

included a background check in the United States of the Step-Father. *Id.*

On February 1, 2012, the Hastings County Court ordered Mother to file S.A.M.'s passport with the solicitors for the guardian or with the court office at Hastings County Court within 48 hours of being served with the order. Pet.'s Ex. 4. On February 20, 2012, Mother filed S.A.M.'s passport with Mother's solicitor. Pet.'s Ex. 5. Mother's solicitor undertook to the court "not to release the passport of [S.A.M.] nor to release the passport to any other party without the prior consent of the court." Pet.'s Ex. 5. Thus, in order for Mother to have S.A.M.'s passport returned to her, she would need the consent of the court.

Mother alleged in her testimony that about a month later she was planning for holiday in the United States and she forgot that she had lodged S.A.M.'s passport with her solicitor. As a result, Mother alleged she filed for replacement passports for herself[3] and S.A.M. on April 7, 2012. Pet.'s Ex. 6. Mother told the passport agency that she needed a replacement passport for S.A.M. because she had put the passport in a safe place at home and could not locate it. *Id.* Mother and Step-Father testified that Mother did not remember that S.A.M.'s passport was with Mother's solicitor until Mother spoke with Step-Father the evening *after* she applied for the replacement passports. At that time, Step-Father reminded Mother that S.A.M.'s passport was with Mother's solicitor. On April 24, 2012, Mother received replacement passports for herself and S.A.M. from the United Kingdom's Passport Agency. Pet.'s Ex. 8, 9. Mother did not notify her solicitor or the court that she had applied for and received a replacement passport for

---

[3]Mother testified that her passport was damaged when her home in East Sussex was flooded. Therefore, she applied for a replacement passport.

S.A.M.  On April 27, 2012, Mother also applied for and obtained a travel visa for the United States for herself and S.A.M.  Pet.'s Ex. 10.

On May 31, 2012, Ms. Smee-Giles met with Mother.  Ms. Smee-Giles testified that at the meeting, Mother informed Ms. Smee-Giles that her Visa application had been delayed for some time.  However, only one day after the meeting, on June 1, 2012, Mother removed S.A.M. from the United Kingdom to Canada. On June 4, 2012, Mother and S.A.M. entered the United States via the Rainbow Bridge in Niagara Falls.  Pet.'s Ex. 8, 9.  Mother and S.A.M. met Step-Father at Niagara Falls.  Mother testified that S.A.M. was so happy to be with Step-Father that she could not separate them.  In the following days, Mother traveled with S.A.M. to Step-Father's home in Hedgesville, West Virginia.  Since this time, S.A.M. has resided in Hedgesville, West Virginia with Mother and Step-Father.  Until S.A.M.'s removal from the United Kingdom on June 1, 2012, S.A.M. has always lived there.  She attended school in the United Kingdom, and she had friends and extended family there.

On June 11, 2012, Mother e-mailed Ms. Smee-Giles to inform her that a scheduled supervised visit between S.A.M. and her half-brother A. could not take place because S.A.M. had chicken pox.[4]  Pet.'s Ex. 17.  The Court finds that Mother wrote the e-mail to deceive East Sussex as to her and S.A.M.'s whereabouts.  Ms. Smee-Giles testified that Mother's e-mail was unusual as she had never received an e-mail from

---

[4]Although Mother testified she thought she could leave and the English Court's Order was not prohibiting her from removing S.A.M. from the United Kingdom, the Court notes that when Mother subsequently spoke with Ms. Smee-Giles she did not disclose her and S.A.M.'s whereabouts. Therefore, based upon the inconsistencies in Mother's testimony, the Court finds she is not credible.

Mother, so, on June 12, 2012 she conducted an unannounced visit to the family home. When she arrived at the family home, it was clear that Mother and S.A.M. had left the address. Ms. Smee-Giles testified that the house was locked up and that there was a mattress sitting in the doorway. At that point, Ms. Smee-Giles notified S.A.M.'s guardian, and S.A.M.'s guardian called an emergency hearing in Hastings County Court. At the emergency hearing, the Hastings County Court entered an Interim Care Order placing the Child in the care of East Sussex County Council Social Services. Pet.'s Ex. 11. The Order granted East Sussex Children Services and East Sussex County Council shared parental responsibility over S.A.M. under the Children Act of 1989. The Order also provides the following:

> WARNING: Where a Care Order is in force no person may cause the child to be known by a new surname or remove the child from the United Kingdom without written consent of every person with parental responsibility for the child or leave of court. However, the local authority, in whose care the child is, may remove the child from the United Kingdom for a period of less than 1 month. It may be a criminal offence under the Child Abduction Act 1984 to remove the child from the United Kingdom without the leave of the court.

On June 28, 2012, prior to discovering that Mother had removed S.A.M. from the United Kingdom, Justice Moylan of the High Court of Justice, Principal Registry of the Family Division, entered a Passport Order ordering the Mother to hand over to the Tipstaff all of S.A.M.'s and Mother's passports and any and all other travel documents, prohibiting Mother from obtaining or attempting to obtain replacement passports for herself or S.A.M., and prohibiting Mother from removing S.A.M. from the United Kingdom. Pet.'s Ex. 13. After learning of S.A.M.'s removal from the United Kingdom, East Sussex prepared and filed its Application for Return of the Child and submitted the

Application to the Central Authority for England and Wales on July 5, 2012. Pet.'s Ex. 14. The Application was transmitted to the United States Central Authority.

On December 3, 2012, Petitioner filed its Verified Petition for the Return of the Child to the United Kingdom and Issuance of Show Cause Order. Petitioner contends that Mother illegally and wrongfully removed S.A.M. from her habitual residence of the United Kingdom, and both Mother and Step-Father have wrongfully retained S.A.M. in West Virginia. On December 11, the Respondents filed their Response to the Petition. Respondents allege that they have sole custody of S.A.M., and removal was not wrongful. Additionally, Respondents allege that S.A.M. has a home, friends, and family in the United States and that she has easily adjusted to life in the United States.

On December 13, 2012, the Court conducted a hearing to show cause why the Petition should not be enforced. Among other things, the Court ordered the Respondent Ralph Morris to provide his social security number to the Court. Then, the Court ordered the United States Probation Office to conduct a background check on Step-Father. The Court also ordered Mother to turn into the Clerk of Court her passport and S.A.M.'s passport on December 19, 2012, which was the day after the Respondents and S.A.M. were required to attend a previously scheduled immigration interview in Pittsburgh, Pennsylvania, regarding their application for United States citizenship. On December 19, Mother turned in her passport and S.A.M.'s passport to the Clerk of Court for safe-keeping until the case was resolved. On December 21, 2012, Mother and S.A.M. received their green cards.

On January 4, 2013, the Court conducted a final evidentiary hearing to determine whether the Petitioner's Verified Petition for Return of Child to United Kingdom should

be enforced.  At the hearing, the Court listened to testimony, received evidence, and heard arguments from the parties on the Petition.  The Court reserved ruling on this matter until January 18, 2013 at 9:00 a.m.  Mother was ordered to surrender S.A.M.'s green card to the clerk of the court for safe-keeping.

### III.  Jurisdiction

This Court has jurisdiction pursuant to The Convention on the Civil Aspects of International Child Abduction ("Hague Convention")[5] and the International Child Abduction Remedies Act ("ICARA").  The district courts of the United States have been granted original jurisdiction over actions arising under the Hague Convention.  **42 U.S.C. § 11603**.

Venue is appropriate because ICARA provides that a Hague Convention petitioner can only bring a Hague Convention action in the place where the child is located**. 42 U.S.C. § 11603**.  In this case, S.A.M. resides in Hedgesville, West Virginia. Therefore, she is located in the Northern District of West Virginia.

### IV.  Legal Standard

In adopting the Hague Convention, the signatory nations sought "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  ***Miller v. Miller***, 240

---

[5]Both the United States and the United Kingdom are signatories to the Hague Convention.

F.3d 392, 398 (4th Cir. 2001).[6]  Therefore, the primary purpose of the Hague

Convention is "to preserve the status quo and to deter parents from crossing

international boundaries in search of a more sympathetic court." *Id.*

Under the Hague Convention, the scope of a court's inquiry is limited to the

merits of the abduction claim.  **42 U.S.C. § 11601(b)(4)**; *see Miller*, 240 F.3d at 398

(noting that under the Hague Convention, the court's inquiry is limited to the merits of

the abduction claim and the underlying custody case is not at issue).  Thus, the issue is

whether the removal and retention of the Child is wrongful under Article III of the Hague

Convention.  If the removal is wrongful, the next inquiry is whether Respondents have a

valid defense.

## V.  Discussion

### A. Petitioner's Burden of Proof

Petitioner must establish by a preponderance of the evidence "in the case of an

action for the return of a child, that the child has been wrongfully removed or retained

within the meaning of the Convention."  **42 U.S.C. § 11603(e)(1)(A)**.  A child's removal

or retention is wrongful where:

> a) it is in breach of rights of custody attributed to a person, an institution or
> any other body, either jointly or alone, under the law of the State in which
> the child was habitually resident immediately before the removal or
> retention; and
>
> b) at the time of removal or retention those rights were actually exercised,
> either jointly or alone, or would have been so exercised but for the
> removal or retention.

---

[6]The United States implemented the Convention through ICARA, and the Act authorizes
a person who seeks a child's return to file a petition in state or federal court. **42 U.S.C. § 11603.**
The court must decide the case in accordance with the Hague Convention. *Id.*

**Hague Convention, art. 3,** T.I.A.S. No. 11,670 at 2, 19 I.L.M. at 1501.

In this case, the Petitioner must prove that:

**(1)** S.A.M. is under the age of sixteen (16) (Hague Convention, Art. 3(a));

**(2)** S.A.M. was "habitually resident" in the United Kingdom at the time Mother removed her to the United States;

**(3)** the removal was in breach of Petitioner's custody rights under the United Kingdom's laws (removal was "wrongful"); and

**(4)** Petitioner had been exercising its custody rights at the time of Mother's removal of S.A.M. *See **id.***; *see also **Bader v. Kramer***, 484 F.3d 666 (4th Cir. 2007).

### 1.    S.A.M. is Under Sixteen Years Old

At the final evidentiary hearing, Petitioner moved into evidence a certified copy of S.A.M.'s birth certificate.  Petitioner's witness, Ms. Smee-Giles, identified the document as S.A.M.'s birth certificate, and Respondents did not object to its admission.  The birth certificate, marked and admitted as Petitioner's Exhibit 1, clearly shows that S.A.M. is twelve years old and that she was born in 2000.  Therefore, the first element has been met.

### 2.    S.A.M. was Habitually Resident in the United Kingdom

The Hague Convention does not define "habitual residence."  In making this determination the Fourth Circuit has concluded that:

> there is no real distinction between ordinary residence and habitual residence. . . . A person can have only one habitual residence.  On its face, habitual residence pertains to customary residence prior to the removal.  The court must look back in time, not forward.  This is a fact-

specific inquiry that should be made on a case-by-case basis.  Moreover, .
. . a parent cannot create a new habitual residence by wrongfully removing
and sequestering a child.

*Miller*, 240 F.3d at 400 (citations omitted).  Habitual residence "pertains to customary

residence prior to the removal.  The court must look back in time, not forward."  *Id.*  In

determining habitual residence, "a parent cannot create a new habitual residence by

wrongfully removing and sequestering a child."  *Id.* (citation omitted).

Here, Mother made a unilateral decision to remove S.A.M. from the United

Kingdom.  On the date of removal, Petitioner was unaware of Mother's intention to

remove the child, and Petitioner had not acquiesced to S.A.M.'s removal.  In fact, the

day before S.A.M.'s removal, Mother met with Petitioner and stated her travel Visa was

delayed, so they would not be leaving the United Kingdom for a few months.  Prior to

S.A.M.'s removal, Mother and S.A.M. resided in St. Leonards on Sea in East Sussex.

According to Ms. Smee-Giles' testimony, S.A.M. had lived in the United Kingdom her

whole life.   S.A.M. attended school in the United Kingdom, and she had extended

family and friends there. On April 27, 2012, Mother applied for a travel visa to the United

States, and Mother listed S.A.M.'s country of residence as the United Kingdom.  Pet.'s

Ex. 10. Additionally, Step-Father and Mother testified that on June 1, 2012, Mother's

intention was merely to vacation in Canada and then in the United States at Niagara

Falls.  Step-Father admitted on cross-examination that, at the time S.A.M. entered the

United States, her home was in the United Kingdom.  Moreover, Mother could not

create a new habitual residence by wrongfully removing S.A.M.  Therefore, the Court

finds by a preponderance of the evidence that the United Kingdom was the habitual

residence of S.A.M. immediately before her removal to the United States.

### 3. Removal was in Breach of Petitioner's Custody Rights Under the United Kingdom's Laws

The Hague Convention provides that removal of a Child to a foreign country is "wrongful" if it amounts to a breach of the custody rights of the left-behind parent, or institution with custody rights, according to the law of the country that is the Child's habitual residence, and the Court is permitted to take judicial notice of that country's laws. *See* **Hague Convention, art. 14, FED. R. CIV. P. 44.1**. Having found that the United Kingdom was the habitual residence of S.A.M., the Court takes judicial notice of the Children Act of 1989, the Affidavit of English and Welsh Law (Pet.'s Ex. 16), and the following two cases: *Re: E.* (Abduction: Rights of Custody), [2005] EWHC (Fam), 2 FLR 759 and *X County Council v. B* (Abduction: Rights of Custody in the Court), [2009] EWHC (Fam), 1 FLR 1197.[7] Thus, whether S.A.M.'s removal was wrongful depends on whether her removal was in breach of East Sussex Children Services' custody rights and the United Kingdom's court's custody rights under the United Kingdom's laws.

Under the Hague Convention, "rights of custody" are defined as including "rights relating to the care of the person of the child, and in particular, the right to determine the child's residence." **Hague Convention, art. 5**; *see* **Child Abduction and Custody Act 1985**, Schedule 1, Article 5 (United Kingdom adopting Hague Convention's definition of custody rights). Custody rights have been broadly interpreted, but custody rights do not

---

[7]The Court does not find *X County Council v. B* to be on point. In that case, care proceedings were already instituted against the parents, and the court clearly had discretion and jurisdiction to determine the child's place of residence. In this case, care proceedings were not initiated until after removal. However, as discussed below, the English court had "custody rights" pursuant to the Hague Convention.

include rights of access alone. The Supreme Court set forth four sources for interpreting parental custody rights: (1) the Hague Convention's text, (2) the Hague Convention's purposes, (3) the view of the U.S. State Department, and (4) decisions of sister signatory states to the Hague Convention. **Abbott v. Abbott**, 560 U.S. ___, 130 S. Ct. 1983 (2010).[8] **Abbott** addressed the issue of whether a *ne exeat*[9] clause, coupled with rights of visitation, constituted sufficient "custody rights" under the Convention. In *Abbott*, mother, father, and child lived in Chile since the child was an infant. The Chilean court granted mother the daily care and control of the child, and father was granted "direct and regular" visitation. According to Chilean statute, once a parent is granted visitation rights, a *ne exeat* right is conferred, requiring the custodial parent's permission before the child may be removed from the country. While custody proceedings were still pending in Chile, the mother took the child to Texas in violation of the Chilean court order. Father filed a petition under the Hague Convention. The Supreme Court held that father's statutory *ne exeat* clause gave him both the right to determine the child's place of residence and a joint right relating to the care of the child. The Court noted that although a *ne exeat* clause did not fit within "traditional notions of physical custody," the Convention nevertheless established an increasingly broad definition of custody rights. **Abbott**, 130 S. Ct. at 1991. Thus, father had "custody

---

[8]*Abbott* is the only United States Supreme Court case to date applying and discussing in detail the Hague Convention.

[9]A *ne exeat* clause is "An equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction. A *ne exeat* is often issued to prohibit a person from removing a child or property from the jurisdiction . . . ." Black's Law Dictionary (8th ed. 2004). In the United States, these orders are routinely referred to as "restraining orders," which prohibit removal of a child from a state or local jurisdiction.

rights" for purposes of the Hague Convention. *Id.* at 1992-93.

Custody rights, though, must be more than mere visitation or "access" rights. *See Bromley v. Bromley*, 30 F. Supp. 2d 857, 860 (E.D. Pa. 1998). Although the vast majority of cases involve parents or relatives claiming custody rights, administrative agencies or other bodies may claim custody rights. *See* **In Re *S.J.O.B.G.***, 292 S.W.3d 764 (Tex. App. 2009) (custody rights claimed by the Child Welfare Services of Norwegian Municipality); *L.H. v. Youth Welfare Office of Wiesbaden*, 568 N.Y.S.2d 852 (Fam. Ct. 1991) (holding that where a child is placed by the German Child Welfare Office into foster care, the child's biological mother's custody rights can be taken by the court declaring the child a ward of the German court); *Brown v. Orange Cnty. Dep't of Soc. Servs.*, 91 F.3d 150, 1996 WL 366366 (9th Cir. 1996) (alleging wrongful removal of child by child welfare agency). Additionally, under English law, a court is "obliged not simply to give effect to the Hague Convention on the basis of breach of the rights of an individual; the infringement of the rights of custody of an 'institution or any other body' . . . would also lead to a finding that a removal or retention was wrongful." *Re: E. (Abduction: Rights of Custody)*, [2005] EWHC (Fam), 2 FLR 759 (finding the Spanish Court, the court in the State in which the Child was habitually resident at the time of removal, was an institution whose rights relating to custody were infringed by the mother's wrongful removal of the child).

In this case, East Sussex Children Services asserted the United Kingdom's court's custody rights under the Hague Convention prior to S.A.M.'s removal. On February 21, 2010, S.A.M. was under a Child Protection Plan, enacted due to the risk of

emotional harm to S.A.M. According to Ms. Smee-Giles' testimony, she was required under United Kingdom law to see children on those plans at least every ten days in person. Therefore, East Sussex Children Services regularly supervised S.A.M.'s well-being. In addition, the Child Protection Plan at issue in this case required Mother to notify East Sussex of any intention to remove the child from the country, or even when moving addresses *within* the country. When Mother removed S.A.M. from the United Kingdom, the Child Protection Plan was still in place.

Most importantly, on February 1, 2012, the Hastings County Court ordered Mother to "lodge the passport of [S.A.M.] . . . with either Elaine Parkes & Co., as solicitors for the guardian, or with the court office at Hastings County Court." Pet.'s Ex. 4. Mother lodged S.A.M.'s passport with her Solicitor, who took an oath to the court not to release S.A.M.'s passport "to any other party without the prior consent of the court." Pet.'s Ex. 5. Ms. Smee-Giles testified that the Court's order regarding S.A.M.'s passport was to ensure that should S.A.M. be removed from the country, the court would be made aware of that intention *prior* to her removal. Pursuant to Petitioner's Exhibit 4, Mother would need consent of the court to obtain S.A.M.'s passport in order to leave the country. Thus, if Mother desired to remove S.A.M. from the country, she must inform and receive permission from the English court. According to Petitioner's Exhibit 16, an Affidavit of English and Welsh Law admitted pursuant to Article 14 of the Hague Convention, the English Court exercised its rights of custody on February 20, 2012, when Mother's solicitor undertook to the court not to release S.A.M.'s passport to any other party without the prior consent of the court. Pet.'s Ex. 16. The Court finds that the February 1, 2012 and February 20, 2012 orders created a *ne exeat* right, and the United

States Supreme Court has concluded that "*ne exeat* rights are rights of custody . . . ." **Abbott**, 130 S.Ct. at 1993.

Respondents argue that the February 2012 orders were insufficient to establish custody rights because Mother was never directly ordered that she could not leave the country with S.A.M. Respondent Carly Morris also contends, and Ms. Smee-Giles admitted, that she alone had sole custody and parental responsibility over S.A.M. until the June 12, 2012 Interim Care Order, which was issued a*fter* S.A.M.'s removal.

However, the Court finds that the Hastings County Court's February 1, 2012 order is a *ne exeat* order that conferred custody rights upon the court. Petitioner, East Sussex Children Services, asserting the court's custody rights, could determine S.A.M.'s residence by requiring East Sussex Children Services' and the Hastings County Court's consent for S.A.M. to leave the United Kingdom. This case is similar to *Abbott*, where the United States Supreme Court found that a parent with only access rights acquired custody rights because a *ne exeat* clause accompanied the access rights. *See* 560 U.S. ___. 130 S. Ct. 1983. Here, Petitioner and the United Kingdom's courts acquired custody rights through the court's *ne exeat* order. Although a *ne exeat* order does not fit within "traditional notions of physical custody," the Convention nevertheless established an increasingly broad definition of custody rights. **Abbott**, 130 S. Ct. at 1991. Therefore, construing the definition of custody rights broadly pursuant to the text and purpose of the Hague Convention, the Court finds that Petitioner had custody rights over S.A.M. at the time of removal.

The Court notes that the Interim Care Order issued on June 12, 2012, conferred

custody rights under the Children Act 1989, Section 38, undoubtedly gave East Sussex custody rights under the Hague Convention. However, the Hague Convention requires the Petitioner to have custody rights *prior* to the removal of the Child. Here, S.A.M. was removed on June 1, 2012. The Interim Care Order was not issued until June 12, 2012. Therefore, it is irrelevant whether this conferred custody rights as the Petitioner must have had custody rights prior to June 1, 2012.

## 4. Petitioner Was Exercising its Custody Rights at the Time of the Removal

In determining whether removal is wrongful, the Petitioner must prove that it had been exercising its custodial rights at the time of removal. **42 U.S.C. § 11603(e)(1)**. The Fourth Circuit Court of Appeals will liberally find "exercise" of a nonremoving parent's custodial rights, as required for removal to be wrongful under the Hague Convention whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child. ***Bader,*** 484 F.3d at 671. Under this approach,

> a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.

***Id.*** (affirming district court's finding that petitioner had exercised his right to joint custody because he had actual physical custody of the child on at least three occasions since his release from prison).

As explained above, the Petitioner had custody rights under the February 2010 Child Protection Plan. Petitioner regularly monitored and supervised Mother and S.A.M.

pursuant to the plan, and this included an in person visit with S.A.M. every ten days. Also, in February 2012, the Court instructed Mother to lodge S.A.M.'s passport with S.A.M.'s solicitor or the Court for safe-keeping. Although Mother ultimately turned S.A.M.'s passport into Mother's solicitor, the solicitor undertook not to release the passport to any other party. The Court's order exercised custody rights as it was designed to prevent Mother from unilaterally removing S.A.M. from the United Kingdom. Therefore, the Court finds that Petitioner was exercising its custody rights at the time of S.A.M.'s removal.

Accordingly, the Court concludes that pursuant to the Hague Convention and ICARA, Petitioner has proven by a preponderance of the evidence that on June 1, 2012, Mother wrongfully removed S.A.M. from the United Kingdom–S.A.M.'s habitual residence at that time.

**B. Respondent's Burden of Proof**

Upon a showing of wrongful removal, return of the child is required under the Hague Convention unless Respondents can establish one of four available defenses. *See* **42 U.S.C. § 11603(e)(2)(A-B)** (requiring Respondent to establish by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies or establishing by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies). Respondents may prevail if they can prove one of the following defenses by clear and convincing evidence:

**(1)** that there was a grave risk that the child's return to Petitioner would

expose them to physical or psychological harm or otherwise place them in

an intolerable situation, *see* **Hague Convention, art. 13b**, or

**(2)** that the return of the child to the United Kingdom would not be

permitted by the fundamental principles of the United States "relating to

the protection of human rights and fundamental freedoms[,]" *see* **Hague**

**Convention, art. 20**.

The Respondents could also prevail if they establish by a preponderance of the

evidence, that:

**(1)** this action was not commenced within one year of the abduction, and the

child is now well-settled in her new environment, *see* **Hague Convention**, **art.**

**12**, or

**(2)** that Petitioner "consented to or subsequently acquiesced in the removal[,]"

**Hague Convention, art. 13a**.

*See also* **42 U.S.C. § 11601(a)(4)**; ***Judge v. Williams***, No. 4:11-CV-119-F, 2011 WL

3100346 (E.D.N.C. July 25, 2011).  Also, "the courts retain the discretion to order return

even if one of the exceptions is proven."  ***Miller***, 240 F.3d at 402 (quoting ***Feder v.***

***Evans-Feder***, 63 F.3d 217, 226 (3d Cir. 1995)).  The Fourth Circuit has stated that

> courts in the abducted-from country are as ready and able as we are to
> protect children.  If return to a country, or to the custody of a parent in that
> country, is dangerous, we can expect that country's courts to respond
> accordingly . . . . When we trust the court system in the abducted-from
> country, the vast majority of claims of harm—those that do not rise to the
> level of gravity required by the Convention–evaporate.

***Miller***, 240 F.3d at 402 (quoting ***Friedrich v. Friedrich***, 78 F.3d 1060, 1068 (6th Cir.

1996)).

In this case, Respondents have raised only one defense: that there was a grave risk that S.A.M.'s return to Petitioner would expose her to physical or psychological harm or otherwise place her in an intolerable situation. *See* **Hague Convention, art. 13b**. Courts have indicated that the grave risk defense was not intended to be used as a vehicle to litigate the child's best interests or place the child where he or she would be happiest. *See **Gaudin v. Remis,*** 415 3d. 1028 (9th Cir. 2005); ***Blondin v. DuBois***, 238 F.3d 153, 163 (2d Cir. 2001). The defense does not apply to evidence relating to economic conditions, educational benefits, lifestyles, or disparate quality of parenting styles. ***Cuellar v. Joyce***, 596 F.3d 505, 509 (9th Cir. 2010) ("[t]he fact that a child has grown accustomed to her new home is never a valid concern under the grave risk exception, as 'it is the *abduction* that causes the pangs of subsequent return.'"). The situation contemplated by Article 13(b) would include sending a child back to a "zone of war, famine, or disease" as well as "cases of serious abuse or neglect . . . ." *See* ***Danaipour v. McLarey***, 286 F.3d 1, 14 (1st Cir. 2002).

Respondents have failed to show, by clear and convincing evidence, that returning S.A.M. to the United Kingdom would result in a grave risk that would expose her to physical or psychological harm or otherwise place her in an intolerable situation. Mother testified that S.A.M. would be exposed to a grave risk because of the emotional harm and distress of the proceedings as well as being returned to a completely intolerable situation. However, the emotional harm and distress resulting from this proceeding was created by Mother's wrongful removal of S.A.M. This is not the "grave risk" contemplated by the Hague Convention. Thus, the Respondents have failed to

present any valid defenses under the Hague Convention. Accordingly, the Court **GRANTS** Petitioner's petition and **ORDERS** S.A.M.'s return to the United Kingdom.

### C. Fees and Costs

The Hague Convention and its enabling legislation require a court to order the respondent to pay the petitioner's necessary expenses if the court orders the return of the child, unless such an award would be "clearly inappropriate." **Hague Convention, art. 26; 42 U.S.C. § 11607**; **42 U.S.C. § 11607(b)(3).** With respect to the award of attorney's fees and costs, ICARA provides:

> Any Court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such an award would be clearly inappropriate.

**42 U.S.C. § 11607(b)(3).** Under the Hague Convention, an award of fees and costs serves two purposes: (1) "to restore the applicant to the financial position he or she would have been in had there been no removal or retention" and (2) "to deter such removal or retention." **Hague Convention; Text and Legal Analysis**, 51 Fed. Reg. 10494-01, 10511 (Mar. 26, 1986).

A party seeking an award of attorney's fees must submit adequate evidence detailing the hours worked and his or her rates. ***Hensley v. Eckerhart***, 461 U.S., 424, 433, 103 S. Ct. 1933 (1983). Although Petitioner sought attorneys fees in its petition, no evidence has been presented to the Court regarding the hours worked or his or her rates. Additionally, given the Respondents' financial conditions, they would be entirely

unable to pay such an award. Thus, it would be clearly inappropriate to grant an award of attorneys fees and costs as Petitioner has not presented adequate evidence to substantiate such a request and Respondents would be unable to pay any amount of an award.

## VI. Conclusion

Because S.A.M. was wrongfully removed from the United Kingdom, her pre-removal habitual place of residence, and because Respondents have not proven any of the defenses to return under the Hague Convention or ICARA, it is hereby **ORDERED** that:

1. Petitioner East Sussex Children Services's petition for the return of S.A.M., pursuant to the Hague Convention, is **GRANTED**.

2. Respondent Carly Morris has agreed to accompany S.A.M. back to the United Kingdom if she is physically able to travel in light of her pregnancy and health conditions. Respondent Carly Morris has testified under oath to her health conditions, and the Court finds that she is genuinely concerned about her well-being and the well-being of her unborn child. Because of the Court's concern and the parties' mutual concern for the well-being of Respondent Carly Morris and her unborn child, the Court **ORDERS** that the enforcement of the Petition is temporarily **STAYED** pursuant to this Court's authority under 42 U.S.C. § 11604, and the following conditions are **ORDERED** to protect the well-being of S.A.M. and her return to the United Kingdom:

a. Respondent Carly Morris' passport and S.A.M.'s passport and green card must remain in the custody of the Court;

b.  S.A.M. may not travel outside the counties of Berkeley, Jefferson, and Morgan, West Virginia;

c.  Respondents Carly and Ralph Morris are prohibited from obtaining any other travel documents for themselves or S.A.M. until this proceeding is resolved in its entirety;

d. Respondent Ralph Regis Morris is no longer required to be supervised during his contact with S.A.M.;

e. Respondent Carly Morris is ordered to call her physician at Shenandoah Women's Health to confirm the date of her next appointment and to alert the physician that she is need of an evaluation and report regarding her ability to travel to the United Kingdom;

f. Respondent Carly Morris is ordered to file with this Court, by Tuesday, January 22, 2013, in written form, a note clarifying the date and time of her next appointment;

g. Respondent Carly Morris shall file the physician's report regarding her ability to travel to the United Kingdom as soon as she receives the report, and the report will be filed under seal;

h.  Respondents shall not change their physical address or place of residence without prior consent of the Court;

3.   Petitioner and Respondents are ordered to appear before the Court on **February 12, 2013 at 1:00 p.m.** in Martinsburg District Judge Courtroom.  S.A.M. is not ordered to attend the hearing.

4.    This Order shall be transmitted by the Clerk of the Court to the United

States Department of State for transmittal to the Central Authority of the United Kingdom.

     5.    The Clerk is directed to mail a certified copy of this Order to all counsel of record and *pro se* parties.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is directed to enter judgment on this matter.

     **DATED:** January 22, 2013

_____
GINA M. GROH
UNITED STATES DISTRICT JUDGE